[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: POST JUDGMENT MOTIONS
ENTRY NO. 122 — MOTION FOR EXPERT FEES
DOCKET ENTRY NO. 136 — REMOVAL OF GUARDIAN AD LITEM AND SKANE SERVICES AND FOR APPOINTMENT OF SUPERVISOR
DOCKET ENTRY NO. 137 AND 138 — MOTION FOR ORDER OF ATTORNEY FEES
DOCKET ENTRY NO. 139 — MOTION TO TERMINATE SUPERVISED VISITATION AND INSTITUTE UNSUPERVISED VISITATION
DOCKET ENTRY NO. 145 — DEFENDANT'S MOTION FOR CONTEMPT
DOCKET ENTRY NO. 149 — GUARDIAN AD LITEM'S MOTION FOR CONTEMPT
BACKGROUND:
The plaintiff and defendant met in 1993 in California and began a sexual relationship lasting three years. The plaintiff was then and continues to be unmarried. She is presently thirty-six years old, in good health, and operates a day care center out of her mother's home where she resides with her four year old daughter April and April's maternal grandmother. When the plaintiff met the defendant, he was and continues to be married (That marriage is now of twenty years duration.). On October 16, 1996, a daughter (April) was born to them. The relationship thereafter terminated and the plaintiff thus began a tortured saga of recriminations, accusations, and legal actions involving state and federal courts in California and Connecticut. There have been numerous criminal, civil, and family court actions. The plaintiff continued to reside in Connecticut and the defendant still lives with his wife in California. He is a musician/composer who claims to be presently unemployed but is capable of earning a living in a variety of ways in the CT Page 9479 music/entertainment industry. April is the only child of both parties.
On December 5, 1996, the parties appeared in a Los Angeles, California, superior court and agreed they would share joint legal custody of April. That agreement was made an Order of the court as were child support payments and. a visitation schedule for the father. Some time early in 1997, the plaintiff moved from that state to Connecticut without either prior notice to the defendant or Order of the court and, by so doing, she emasculated the father's visitation rights. Nevertheless, despite the need to travel from one coast to another, to arrange for transportation within this state, and to incur expenses for hotel accommodations, meals, etc., the defendant has consistently demonstrated his willingness to do whatever was required in order that he have the opportunity to spend time with his daughter and to develop a father-daughter relationship. However, all did not go well and, at least as early as February of 1999, the legal system became involved in these parties' disputes regarding April. In the interim, numerous counsel have been appointed guardians ad litem for the child, no fewer than six Connecticut judges have entered Orders, mediation with Janet Daigle-Esposito (this court's Family Services Supervisor) has failed and, in the spring of 2000, an height day trial was held before Cutsumpas, J. Approximately twenty witnesses — to include court appointed psychological evaluators — testified and over one hundred exhibits were marked. At the core of that trial were the defendant's custody and visitation rights. In a twenty-three page memorandum of decision on July 14, 2000, the court entered Orders on no fewer than eight motions, most of which were filed by the plaintiff mother and raised the same issues with most of the same evidence presented by the instant plethora of motions. This trial spanned five court days; twelve witnesses testified; thirty-four exhibits were offered. The centerpiece of this trial was again the defendant father's visitation rights. Given the severity of the charges the plaintiff has made with regard not only to the defendant but to many other witnesses, this court has carefully observed the witnesses demeanor, evaluated their credibility, and carefully examined all exhibits to include an extensive DCF file and two video tapes.
To chronicle in detail this tumultuous relationship would serve little purpose except to titillate. It is, however, relevant to state the relationship involved at least one voluntary abortion and a claim the defendant forcibly raped and threatened the plaintiff on multiple occasions (The plaintiff has in the past claimed April's birth was the result of one such instance of forcible rape.). Pertinent to that claim is that the plaintiff not only invited the defendant to be present at the birth but, when she was brought to the hospital, she tracked him down by beeper to ensure his presence at the birthing. It is also so that the CT Page 9480 plaintiff announced to the defendant's wife by letter that she and the defendant were engaged in an affair and that she was pregnant with the defendant's child; she included with that letter a copy of a sonogram showing the fetus as proof of such pregnancy. It was apparently the plaintiff's hope the defendant's wife would leave him and the defendant would then marry the plaintiff. That never occurred and the defendant and his wife remain married despite the stress the extramarital affair and the years of litigation have obviously placed upon the marriage. The plaintiff has claimed the defendant forced her to have the earlier abortion(s). She has also claimed that, while visiting with April in the Cioffi home in California, Mrs. Cioffi threatened to shoot the plaintiff and the infant. This court has taken judicial notice of all that is contained in this three volume family file.
Over the years, the plaintiff has expressed deep dissatisfaction with the guardians ad litem and court appointed mediators, visitation facilitators, family services, DCF personnel, and psychological evaluators. She has accused each of them of bias and improper job performance. She has rejected as without merit every opinion which does not mirror her own. Here, she has requested the guardian ad litem (Barbara Binford, Esq.) be removed because incompetent, biased, inattentive to her duties as supervisor of visitation, and she has suggested counsel may have been involved in a "personal" relationship with a defense counsel. She has claimed that lawyer has threatened her in courthouse shall ways, in her home, and in restroom facilities. She has claimed Judge Brennan threatened her while he attempted a global mediation. She accused a family relations officer in another courthouse of being too familiar with the defendant and therefore of bias. She also has requested Skane Visitation Center a/k/a Skane Services (now known as Fairfield Counseling and Mediation Services, Inc.) be removed as visitation facilitators because it is similarly incompetent and prejudiced. She has argued the defendant ought not again — as has been the Order of previous courts — be given unsupervised visitation because she claims he has sexually abused April. None of these claims are new claims. They have been fully litigated and have been the subject of DCF and police investigations initiated by the plaintiff. The only new testimony in the instant trial consists of allegations the child advanced regarding the defendant's conduct subsequent to the first trial. More specifically:
1. On or about May 3, of 2000, the plaintiff's application for a restraining order against the defendant was denied by Hauser, J. That application was specifically based upon the above referenced video tapes, the second of which (plaintiff's exhibit Q) is a freeze-frame of a portion of a full video tape (plaintiff's exhibit P) which depicts the defendant's and April's visit to an outdoor carnival on CT Page 9481 April 15, 1999, during which time they walked around the grounds and went on a variety of outdoor rides. The freeze-frame video specifically shows the father with his right hand and a portion of his right arm beneath the child's dress somewhere between the child's waist and her knees (Pertinent is that the child was then three and one-half, petite in build, and dressed in a full dress covering her knees, white tights [under which there was — presumably — appropriate underwear] and a fleece-type winter jacket which fell to just above her knees.). An objective viewer of these two exhibits cannot conclude they show the father's contact with April's private parts or any other form of sexual abuse. There is no visual evidence of the father rubbing the child's vaginal area, no evidence his hand is beneath the child's tights, etc. Nor can it be said this defendant's touching of the child as visualized is in any way at variance with a father's touching of a three year old child who is his and whom he loves. This public touching (The father and child were surrounded by a crowd of people at the time.) produced no visual evidence that April was at all. uncomfortably or made unhappy by the father's contact. This court is fully cognizant of the very real and potentially lifelong trauma occasioned by an adult male's contact with the private areas of a child of such tender years and fully appreciates. the heightened consequences of such behavior when the actor is the child's natural father. Yet, the plaintiff has the burden to produce credible evidence of such unnatural conduct and the video tapes fall far short of meeting that burden. These videos have been viewed now by three courts, all of which have rejected the conclusion urged upon them by the plaintiff. Not again should the plaintiff be permitted to litigate this claim of sexual abuse based upon the now well-worn, often shopped videos.
2. One day after Judge Hauser's denial of the plaintiff's application for a restraining order against this defendant, the plaintiff stated she became suspicious when she noticed a rash in April's vaginal area. She testified April told her that was where "Daddy touches me." The plaintiff next called April's pediatrician, DCF, and the police. The pediatrician's (Dr. Jennifer Gruen's) examination of April was normal (The plaintiff also took April to the Yale New Haven Sexual Abuse Clinic where no evidence of sexual abuse was found.). DCF workers Bridgette Sessa and Kaitlyn Swetts testified in this trial that that department, following an interview with the plaintiff and a "forensic" interview with April (observed by an investigator through a two-way mirror), substantiated the allegations, believing as they did further investigation was necessary. The plaintiff's response was to obtain an ex parte restraining order in Stamford Superior Court, thus bringing another end to the defendant's visits with April. This was immediately followed by the guardian ad litem's motion to halt CT Page 9482 any further physical examinations of the child without further court Order, which motion the court granted. The plaintiff then called a DCF investigator, claiming a conspiracy among various court personnel and a prejudice on the part of the family relations office in favor of the defendant. DCF began to suspect the mother had been coaching the child (Both Ms. Sessa and Ms. Swetts testified to their strong belief of the same in the instant trial.). Although Dr. Deborah Gruen, a forensic pathologist, testified in the first trial (before Cutsumpas, J.) that the child had related to her an incident of sexual abuse, she also testified she could not rule out the possibility the mother had coached April. A licensed clinical investigator, Goldie Winn, testified in both trials the child told her in an interview that her daddy had touched her where she "went pee pee" and that she had at first concluded the child was credible. Her confidence was, however, shaken when, following the interview, the plaintiff said to her, "Did you get it? Did she tell you? I'm glad because my attorney told me April would be taken away from me if I didn't get a disclosure." Ms. Winn testified in this trial that a child's story was less credible the more often that child was asked to repeat a story of abuse, that leading questions served to encourage a child to believe something had happened (in effect, to "create a memory"), and that she was not confident sexual abuse had been established. Relevant is that April discussed the allegation with the plaintiff, the maternal grandmother, and a friend of the plaintiff's as well as with police investigators before she was interviewed by Goldie Winn. Also relevant to the issue of both the plaintiff's credibility and the claim of sexual abuse is that neither the mother's "friend" nor the maternal grandmother testified at trial. Following the psychological evaluation of both parents, DCF made a finding of "unsubstantiation" (translation: they did not conclude there was sexual abuse) To this date, the plaintiff continues to rail against all persons and agencies who have failed to adopt her conclusions. This is so despite the conclusion of all DCF workers that the plaintiff was "hysterical", "histrionic", "demanding", etc., and despite the cracks in the plaintiff's recitation of facts. Diano Saffron, who holds a Master's Degree in Marriage and Family Counseling and who interviewed the parties numerous times between July and September of 2000, was told by the plaintiff that April had been having nightmares in which the child saw monsters who looked like her daddy. In fact, Ms. Saffron testified April told her the monsters were "friendly" ones and that they did not look like her daddy. Ms. Saffron also related the plaintiff cancelled at least one appointment with her and that on another occasion, when Saffron called her because the plaintiff was late for her appointment, the plaintiff said she was "on her way. In fact, another follow-up call to the plaintiff's home that same day CT Page 9483 was answered by a female police officer there in response to the plaintiff's call to complain about the defendant's conduct with April; thus, the plaintiff was not honest in the first conversation with Saffron. Additionally, April told Ms. Saffron her mother told her to tell Saffron she (April) hated her daddy. Ms. Saffron testified the plaintiff made numerous and serious allegations against the defendant in the child's presence and that the effect of the same was to create for the child a "memory — whether or not that "memory" was based on reality. Saffron concluded the plaintiff had an agenda, was not credible, and that her accusations and/or coaching of April were having a traumatic effect upon April Kaitlyn Swetts testified the plaintiff told her the defendant had touched April on the inside of April's leg (This was said in April's presence.); in point of fact, April, who demonstrated an understanding of the difference between "outside" and "inside", said the defendant had touched the outside of her leg.
In the instant trial, the plaintiff described — to the obvious surprise of the defendant, his counsel, and the guardian ad litem — an occurrence that can only be described as bizarre. She testified that, in November of 2000, the father and Attorney Binford arrived at her home to pick up April for a supervised visitation session. The plaintiff related that, while the guardian ad litem was inside the home for ten to twelve minutes to use the bathroom, she observed the father behind the wheel of a car in which April was seated in the rear in a car seat secured in a five point child restraint. April was fully clothed and wearing long pants; the restraint protected her abdominal area and — at least partially — crossed over the vaginal area of the child. As the mother observed the scene through a closed rear window on the driver's side, she stated she observed the defendant — who allegedly had been staring out the front window as he awaited Attorney Binford's return — turn his head to the right (and therefore away from the plaintiff) toward April, extend his right arm over the front seat, and begin "rubbing her in the crotch and upper thigh." In fact, she testified she twice saw him do this — the second time occurring after she turned toward the house only to turn again toward the car to observe the second act of fondling. She stated she then called out the defendant's name and he — startled — turned his head back toward the front window of the car and that his movements became furtive as he avoided eye contact with the plaintiff (This, she testified, was an embarrassed response to his realization the plaintiff had observed his sexual abuse of their daughter.). Almost immediately thereafter, she continued, Attorney Binford emerged from the house and got in the car and the plaintiff watched April, the defendant, and Attorney Binford drive away. Both the defendant and the guardian ad litem vociferously denied the fondling ever occurred and that Attorney CT Page 9484 Binford was inside the house for the period described.
Nothing about the scenario recited by the plaintiff makes sense. The telling of such incident — particularly when considered with all of the other inconsistencies in the plaintiff's testimony and when evaluated against the testimony of other witnesses who present as credible and objective narrators — destroyed whatever vestige of credibility the plaintiff might otherwise have enjoyed. The plaintiff testified she reported the incident that day to the Norwalk police; yet, she offered no documentary or testamentary evidence of such report. She offered no plausible explanation as to why no action was taken by that police department (She did state she was unable to produce a copy of the protective order issued by the criminal court on July 27, 2000, but that of course is to offer no explanation since, regardless of whether there was in effect that protective order, one would surely have expected a follow-up investigation of a sexual assault claim. Nor did the plaintiff testify to any follow-up on her part when that department failed to investigate.). She did not at any time report this incident to the guardian ad litem (who, even if she did not believe the plaintiff, would have had a duty to document the receipt; of the information and to further investigate) nor did the plaintiff seek the assistance of DCF or a counselor who could assess the situation. In short, she exercised none of the options she pursued when, in May of 2000, she claimed April told her the defendant had sexually touched her though, in November of 2000, the plaintiff claims to have been an eye witness to the unnatural touching.
In view of the horrific conduct she described, her testimony that she permitted the defendant to drive away with the child without further follow-up with the guardian ad litem or court system is unpersuasive (She did testify she told her lawyer but had no explanation why he filed no motion or sought legal recourse or that he in fact did anything with regard to her report.). Nor did the plaintiff offer a plausible explanation as to why the defendant would so behave situated as he was in the driveway of the plaintiff's home or how physically he could have made sexual contact with April's private parts given her location in the rear seat restrained by a five point restraint when the seat strap and buckle impeded such contact and when the child was dressed as she was in long pants.
It defies all logic and reason that a mother who had in fact witnessed her former lover and the father or her child demonstrate such despicable conduct upon the person of her daughter would testify as she did that she "would want April to spend time with Billy if properly supervised" when, if she were to be believed, this "child molester and horrible father" required only a matter of moments alone with April to molest her. Part of CT Page 9485 the tragedy is the plaintiff's inability to see that she — not others — is her own worst enemy and that her ferocity to say and do whatever she perceives as necessary to preclude her own daughter's joy in sharing a relationship with her father has not only become her raison d'etre but that her willingness to involve April in this sordid scheme creates for the child a portrait of her father as a sexual deviant whose primary interest in April is as a medium for his own pedophilic gratification.
This plaintiff has raised a lovely child, one who is described by every witness as bright, curious, articulate, and apparently happy. She is attentive to April's every physical need. This court viewed the child on videotape and listened to her in conversation with her mother on audio tape (The mother recorded the conversation so as to preserve the child's response to the plaintiff's questions regarding the father's alleged abuse.). The child presents as a sweet young girl of age appropriate behavior who is well dressed, immaculately groomed, and apparently loving. Nothing in the audio tape suggests other than that the child is happy in her mother's company. Nothing in the child's response to her father as seen on videotape (plaintiff's exhibit P) suggests other than that the child also enjoys her father's company. She appears comfortable holding his hand and in permitting him to touch her hair, caress her arm or back, straighten her clothing, etc. — all acts consistent with a loving father. The plaintiff's failure is that in her self-focused obsession to eradicate the defendant from April's life she in fact creates the true monster in this young girl's nightmare — the deprivation of a loving relationship with her dad. The plaintiff cannot yet see what others have already perceived and that is that her continued baseless accusations against the defendant may well result in April's later rejection of her in favor of the parent whose company was denied her by her mother. When in fact she someday learns — as she surely will — the extent of her mother's willingness to keep her from her father, she may come to view her mother as either or both an incredibly selfish woman obsessed with carving out for April a life peopled by only those "approved" by the mother or as a woman so totally lacking in self-confidence that she cannot permit April to have a relationship with any person the mother feels is threatening for what ever perceived reason. The denouement of this tragic history if the child is not permitted to have a normal, healthy relationship with her father may well additionally be the development of a young woman even more emotionally traumatized and psychologically needy than the mother presently is.
The plaintiff has repeatedly denied the defendant visitation ordered by the court — and often without prior notice to him when he has crossed the country for the sole purpose of visitation with April. In January of 2001, she said the child was too ill; when the guardian ad CT Page 9486 litem called the doctor and was told the visitation could occur even if the child had a fever, the plaintiff packed the daughter up to return her once more to the doctor (though the child was allegedly ill) and left the doctor's office armed with a note that was faxed to the guardian ad litem. In February of 2001, she denied visitation because she "thought" — incorrectly — the Order was for supervision to be provided only by the guardian ad litem (when in fact another facilitator was present with the father); it was the plaintiff's responsibility to know what the Order required and, had she ordered a transcript of the court proceeding, she would have known the guardian ad litem had been given complete freedom to select the supervisor for visitation. In April of 2001 — again without notice to the defendant who had come to this state from California — she left a note on the door of her mother's home ordering him and the guardian ad litem to leave the property and advising them there would be no further visitation until pending motions were decided. This plaintiff was the author of those motions and she is a sophisticated user of the legal system. Thus, she knows court Orders continue in effect until vacated or modified. She thus knew full well Orders are not suspended by the mere filing of a motion. Despite her admission April has a good time when she is with her father, the plaintiff is willing to deny her that "good time" if it serves her own (the plaintiff's) obsessive need to hurt the man who has rejected her.
The continued sabotaging of this father-daughter relationship should encourage a future court to carefully examine the present status of joint legal custody. Any further coaching of the child, any direction to the child that April ought not sit next to daddy or let daddy carry her or hold her, any later evidence that the mother continues to make derogatory or accusatory comments about the father to April or to planting the idea in April's mind that she needs to be "warned" about daddy or that April need not be "afraid" of him (as she once told April in the presence of the guardian ad litem), and, most especially, any wilful violation of this court's Orders should trigger such re-consideration in response to further custody/visitation motions. It is this court's hope a later re-examination of the custody issue may be avoided but that is entirely for the plaintiff to determine since it is she who must put aside this hateful, vengeful aftermath to what has been a tortured and tumultuous history. She must now determine whether her love for April is greater than her hatred of April's father and it is hoped she will obtain the therapy and counseling necessary to permit her realization that true "parenting" is unselfish, antagonistic to egoism, and accepting of all that nourishes and enriches April's development. In the absence of total compliance with the following Orders, a later court presented with a change of custody request (which this court is not) may well determine to place April in the home of the parent whose repeated willingness to sacrifice and whose capacity to love is well-documented. CT Page 9487
 ORDERS
1. No. 122 (Motion re: Expert Fees)
 Two medical doctors (Douglas Curtiss, M.D. and Jennifer Gruen, M.D.) testified at the trial before Cutsumpas, J. Since June of 2000, counsel has moved for payment of their fees. On the first day of the instant trial, counsel again requested payment to each in the amount of $1,050. Neither the plaintiff nor the defendant objected to the amount of the fee which this court finds reasonable. The plaintiff will — within thirty (30) days of this date — pay $1050 to Dr. Curtiss through his counsel (DelSole 
DelSole, LLC of Wallingford, CT); the defendant shall pay — within the same period — the amount of $1050 to Dr. Jennifer Gruen through her counsel. The penalty for late payment by either party shall be at the rate of $25.00 per day.
2. No. 136 (Motion/Removal of Guardian Ad Litem and Skane Services and for Appointment of Visitation Supervisor)
 Denied as moot. See number 3 below.
3. No. 139 (Motion/Terminate Supervised Visitation and Institute Unsupervised Visitation)
 Granted. This court's Order of October 20, 2000, was premised upon the belief supervised visitation was in the child's best interest in view of the father's earlier visitation having been interrupted. It was then believed the plaintiff, who voluntarily entered into an agreement for supervised visitation on that date, would fully comply with the same and the child would therefore be afforded time to re-establish a relationship with the defendant. Since the date of that Order, there has been a material change of circumstances and, having now heard extensive testimony and having found the plaintiff to be without credibility, the court concludes the Order of October 20, 2000, was not in fact in April's best interest. It is therefore appropriate that Order be modified as below stated. See e.g., Hall v. Hall, 186 Conn. 118
(1982); Raymond v. Raymond, 165 Conn. 735 (1974). CT Page 9488
 a. Commencing the third weekend of July, 2001, and continuing every third weekend of each month thereafter and, at his option, on the first weekend of each month beginning August of 2001, the defendant shall have unsupervised visitation from Friday at 6:00 p.m. to Sunday at 5:00 p.m. If the father intends to exercise the optional visitation (on the first weekend of each month), he shall provide the plaintiff five (5) days written notice (so as to provide her no less than forty-eight hours actual notice). He shall provide a copy of the same such written notice to the Chief Clerk of this court and reference docket number FA99-0367352S so as to verify both his compliance with this notice provision and document the plaintiff's receipt of that notice.
 b. The plaintiff shall be advised at all times of where the child will be sleeping each of the two overnights. Neither the plaintiff nor any other person on her behalf shall be within 500 feet of the visitation except for pickup and delivery and no video, audio, or other surveillance of any kind shall be permitted.
 c. The father shall pick up and return the child at the end of the mother's driveway at the appointed times. Upon delivery on Sunday, the father shall remain with the child in the car until the mother or maternal grandmother appears outside the home and the child is seen to be in the care of such person.
 d. The mother is required to provide the defendant two weeks' written notice of any change of address and to provide the defendant such address.
 e. The mother will provide a suitcase containing all appropriate clothing (to include outerware, daytime clothing, underwear, pajamas, and footwear) each visitation weekend and the father shall return all of the same in the same suitcase each Sunday.
 f. The illness of the child shall not be a reason for cancellation of a weekend visitation unless there CT Page 9489 is medical documentation the child is suffering from other than a minor illness (for which care the father is capable of providing) and is being treated by a medical doctor who has penned a dated, signed note which specifies the illness, the treatment, and the period of incapacity required. The mother shall advise the defendant of the child's unavailability as soon as it is known to the mother so as to prevent the unnecessary travel by the father. The father shall have full telephone access to the child's doctor at any time to verify illness, seek treatment advice, etc. The plaintiff's failure to comply with this notice provision timely and any effort on her part to thwart this court's intent shall result in her payment of all documented and reasonable expenses (to include airfare, hotels, ground transportation, car rental costs, meals, etc.) incurred by the defendant in expectation of the visitation. In the event the child is sick from a minor sickness (translation: treatable and neither incapacitating nor requiring the child to remain at home) known to the mother when the visitation begins, she shall provide the defendant all medications and inform him of the dosages and treatment required for the duration of the visitation period.
 g. During each such visitation exercised, the father shall provide the child telephone access to the mother as the child requests. The mother shall not telephone the child except under emergency conditions (for which the mother will provide later written verification at the father's request)
 h. The father shall have the right to communicate with the child by telephone, regular mail, or email at all reasonable times on non-visitation days and the mother is ordered to immediately deliver all mail addressed to the child and to permit all telephone access.
 i. Each of the above provisions is to be strictly construed. The goal of the parties shall be to effectively communicate in the ways here described so as to avoid continued harm to the child. CT Page 9490
 j. All other Orders contained in the Memorandum of Decision of July 14, 2000, not antagonistic to these Orders remain in effect.
4. No. 145 (Defendant's Motion for Contempt)
 Granted. On October 20, 2000, this court entered as an Order that the parties' voluntary agreement of August 16, 2000, be in full force and effect until further Order of the court. The Agreement and Order provided for supervised visitation the third weekend of each month. As above stated, on April 20, 2001, the defendant was present with the guardian ad litem as facilitator of the visitation but was denied the same by way of a note on the door of the plaintiff's home; the note stated there would be no further visitation until the plaintiff's pending motions regarding visitation were heard.
 The Order of the referenced date was clear and unambiguous in expressly stating supervised visitation would continue until further court Order. The plaintiff, an intelligent woman, clearly understood the Order but wilfully violated it. She is found in contempt of that Order and is ordered to pay the sum of One Thousand Dollars ($1,000) within twenty-one (21) days of this date to Glenn Gazin, Esq. for preparation and argument of the instant motion. The penalty for late payment of this sum shall be at the rate of an additional twenty-five dollars ($25.00) per day.
 Present counsel (Glenn Gazin, Esq.) filed the instant motion on April 24, 2001, (the same date on which he filed his appearance). Part of the relief he requested in the motion was that the "defendant" (his client, Mr. Cioffi) be required to pay the "plaintiff" (Ms. Grisanti — not his client) the reasonable attorney's fees incurred by the "plaintiff" (not his client) in the bringing of this motion. Obviously, there is a juxtaposition of the parties since it is clear counsel is not asking the court to order his client to pay Ms. Grisanti and that is underscored by the fact the party bringing this motion" is the defendant. No objection was made at trial with regard to that request nor did Ms. Grisanti — through CT Page 9491 counsel — offer argument regarding the same. At the conclusion of the trial, the court permitted both parties to file whatever additional written documents they wished to file but ordered such documents be provided no later than June 27, 2001. Counsel for Ms. Gristanti filed no additional papers at any time. On June 27, 2001, Attorney Gazin filed a Memorandum of Law, attached to which was an affidavit for services rendered. That affidavit was dated May 30, 2001, and was in the total amount of $7,190 for the period beginning April 6, 2001, and ending April 28, 2001. On June 28, 2001, counsel filed a supplemental affidavit for services in the total amount of $12,010. The difference between the two amounts lies primarily in the attendance at trial on May 29 and May 30, 2001, and the preparation of the eighteen page Memorandum of Law (which, in its Claims for Relief, requests reasonable attorney's fees be paid to his client). No response to either that memorandum of law or the supplemental affidavit of services was made by Ms. Grisanti nor was there filed any request for argument of the same. Connecticut General Statute § 52-256b(a) permits the awarding of reasonable attorney fees to the prevailing party in a motion for contempt. All fees requested by counsel for the defendant were reasonably incurred and at an hourly rate ($200 per hour) generally charged in the community in which counsel practices. Although technically the supplemental affidavit was filed one (1) day late, the court accepts the same since no objection on the basis of untimeliness was filed by the plaintiff. Counsel fees in the amount of $11,010 are ordered to be paid by the plaintiff to Glenn Gazin, Esq. ($1,000 has been deducted from the amount approved since the plaintiff has already been ordered to pay $1,000 as a sanction for being found in contempt of the applicable Order). Payments are to be made as follows:
$2,000 on or by September 20, 2001;
$3,000 on or by November 16, 2001;
$3,000 on or by December 28, 2001; and,
$3,010 on or by February 9, 2002. CT Page 9492
 The penalty for late payment of any of these amounts shall be at the rate of twenty-five dollars ($25.00) per day.
 The court declines the award of attorney fees to Edward Lerner, Esq., despite his affidavit for services dated June 26, 2001, and attached to Attorney Gazin's Memorandum of Law of June 27, 2001. Though Attorney Lerner filed one or more Motions for Contempt based upon the same conduct asserted in Motion No. 145, in no one of them was there a request that attorney fees be paid by the plaintiff and the referenced affidavit is therefore not appropriate.
5. No. 149 (Guardian Ad Litem's Motion for Contempt)
 Granted. This motion arises out of the same circumstances described above regarding Motion No. 145. The court makes the same findings for the above stated reasons. In view of the ruling below regarding Motions No. 137 and 138, no further sanction is imposed.
6. No. 137 and 138. (Guardian Ad Litem's Motion for Attorneys Fees Post Judgment)
 On March 29, 2001, Barbara Binford, Esq., requested the parties pay her fee as Guardian Ad Litem and Supervisor of Visitation for the period beginning June 30, 2000, through January 18, 2001. An affidavit for services in the total amount of $7,510 was submitted. Counsel for neither party exercised his/her right to examine with regard to such affidavit at the instant hearing. The fee is reasonable and the costs incurred were in the performance of the Guardian Ad Litem/Supervisor's court appointed duties.
 The plaintiff has paid $2,300; the defendant is in arrears the sum of $1,490. Each is equally responsible for the sum of $7,510. The plaintiff is ordered to pay Barbara Binford, Esq., the sum of $1,455 and the defendant shall pay $3,755 within forty-five days of this date. The penalty to be imposed for failure to pay the full amount by that date shall be the reasonable expenses incurred by Attorney Binford to travel by air from the State of Washington to Connecticut, ground transportation, lodging, meals, CT Page 9493 etc., incurred in returning to this state for argument of any further motion necessitated by such failure.
B.J. SHEEDY, JUDGE